# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | | |
|---|---|---|---|
| DAVID WILLIAM LOWERY, | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| | ) | | |
| v. | ) | No. | 3:19-CV-386-DCLC-JEM |
| | ) | | |
| WARDEN JAMES HOLLOWAY, | ) | | |
| | ) | | |
| Respondent. | ) | | |

## <u>MEMORANDUM OPINION</u>

Petitioner seeks habeas corpus relief under 28 U.S.C. § 2254 from three state court convictions for aggravated child abuse arising from numerous fractured bones doctors found in his two-month-old son ("the victim") [Doc. 1]. Petitioner challenges these convictions by asserting that his trial counsel was ineffective for (1) failing to consult with a radiologist about the age of the fractures; (2) "fail[ing] to contact and retain defense experts in forensic pediatrics and forensic pediatric radiology;" and (3) failing to ask the trial court to require the victim to have bone fragility testing [*Id.* at 10–14]. Respondent filed a response opposing the petition [Doc. 10] and the state court record [Docs. 7, 8]. Petitioner did not file a reply, and his time for doing so has passed [Doc. 5 p. 1]. After reviewing the parties' filings and the state court record, the Court finds that Petitioner is not entitled to habeas corpus relief under § 2254. Accordingly, the Court will not hold an evidentiary hearing, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the petition will be **DENIED**, and this action will be **DISMISSED**.

## I. BACKGROUND

In his petition, Petitioner asks the Court to take judicial notice of the factual background that the Tennessee Court of Criminal Appeals ("TCCA") set forth in its opinion on his direct appeal

[Doc. 1 p. 6 (citing *State v. Lowery*, No. E2015-00924-CCA-R3-CD, 2016 WL 1253642 (March 30, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016) ("*Lowery I*")]. Petitioner also does not challenge the factual summary of his post-conviction/writ of error coram nobis hearing that the TCCA set forth in its opinion affirming the denial of his petitions for post-conviction and coram nobis relief, *Lowery v. State*, No. E2017-02537-CCA-R3-PC, 2019 WL 2578623 (June 24, 2019) ("*Lowery II*"). [*See generally id.*]. Accordingly, the Court will briefly summarize the factual background for Petitioner's convictions from *Lowery II*, which directly quotes that background from *Lowery I*, as well as other relevant parts of the record, before setting forth the TCCA's summary of Petitioner's post-conviction and writ of error coram nobis proceedings from *Lowery II* and addressing Petitioner's claims.

### A.    Trial Summary

Petitioner and his ex-wife ("the victim's mother") had two children together. *Id.* at *1 (citation omitted). The victim's mother stayed home with the children and was primarily responsible for feeding their youngest child ("the victim"), who was born in November 2007. *Id.* However, Petitioner was responsible for giving the victim his last feeding at night, after the victim's mother went to bed in the same room with their oldest child. *Id.* According to the victim's mother, the victim was generally calm but "'screamed a lot'" when Petitioner held him, and when the victim was about two months old, she found Petitioner holding the victim under his arms and rocking him in a way that she told Petitioner was not good for his neck. *Id.*

On January 24, 2008, when the victim was a little more than two months old, the victim's mother took him to the pediatrician for a well visit. *Id.* at *2. During this appointment, the victim's mother notified the pediatrician that the victim seemed to be having issues moving his left arm. *Id.* at *2. The pediatrician agreed and, during a physical examination of the victim, discovered a

2

bruise under the victim's left shoulder blade that appeared to be in the pattern of an open hand, which the victim's mother had never seen before. *Id.* The pediatrician told the victim's mother to take him to Children's Hospital for x-rays and notified her "that he would have to report his findings to the Department of Children's Services (DCS)." *Id.*

The victim's mother went home to pick up Petitioner and their oldest child to accompany them to the hospital. *Id.* During the ride to the hospital, Petitioner told the victim's mother "that the victim's injuries 'had to have been something [he] had done.'" *Id.*

At the hospital, doctors discovered that the victim had a broken arm and fractures in his legs and ribs. *Id.* When medical providers told Petitioner that the victim needed a CAT scan, Petitioner was angry and asked why it was necessary. *Id.* at *4. All the doctors who testified at trial agreed that the CAT scan showed that the victim may have had a previous brain injury, *id.* at *4, *5, *6, and Dr. Meservy specifically categorized the CAT scan as indicating that the victim had suffered trauma that caused hemorrhages. *Id.* at *5.

The victim's mother denied knowing how the victim was injured, and the first written statement Petitioner gave to police setting forth his activities over the last twenty-four hours did not mention a cause of the victim's injuries. *Id.* at *2–3. But after giving that first written statement, Petitioner told a detective that his wife did not cause the victim's injuries and "it's all on me." *Id.* at *3. Petitioner then described to the detective actions he had taken that could have caused the victim's injuries before drafting a second written statement describing those actions. *Id.* Specifically, as to the victim's broken arm, Petitioner explained that he had pulled the victim out of the swing in a way that must have exerted pressure on the victim's arm. *Id.* Petitioner explained the victim's rib injuries by stating that he had squeezed the victim around his ribs. *Id.* As to the victim's legs, Petitioner stated that, after a diaper change, he had grabbed the victim's

legs to slide the victim toward him, then raised the victim off the bed from the wrong angle. *Id.* According to a DCS case manager who was present at the hospital during Petitioner's police interrogation, Petitioner at first seemed "defensive and tried to 'explain away' the victim's injuries" but was "much more relaxed" and "'seemed relieved that the truth was coming out'" after implicating himself as the cause of the victim's injuries. *Id.* at *4.

At a juvenile court proceeding a few days after the victim left the hospital, Petitioner again described various actions he had taken that could have injured the victim, including squeezing the victim to the point of hearing "something pop on the victim's left side" and raking the victim's rib cage with his knuckles to get the victim to finish his bottle. *Id.* at *4. Petitioner also reiterated that the victim's mother would not have injured either of her sons and was "'a perfect mom.'" *Id.*

A grand jury indicted Petitioner for three counts of aggravated child abuse arising out of the victim's injuries [Doc. 7-1, p. 4–9]. The first count related to the victim's broken arm [*Id.* at 4–5], the second count related to the victim's broken ribs [*Id.* at 6–7], and the third count related to the victim's broken legs [*Id.* at 8–9]. Petitioner proceeded to trial for these charges [Docs. 7-3, 7-4, 7-5].

At Petitioner's trial, the victim's hospital medical providers testified that the victim's injuries were the result of suspected abuse, rather than accidental trauma. *Id.* at *4–6. Dr. Abrams, a pediatrician and expert in pediatric emergency room medicine, specifically testified that it was "'very unusual'" for a two-month-old baby to have bruises, that he did not see signs that the victim had "'nursemaid elbow,'" and that "he saw no evidence that the victim had brittle bone disease," among other things. *Id.* at *4. Dr. Meservy, a pediatric radiology expert, testified in pertinent part that (1) the victim's x-rays showed fourteen healing rib fractures on the victim's left side and seven such fractures on the right side; (2) it appeared "that some of the ribs had been re-fractured from

4

repetitive trauma;" (3) "he assumes a child with multiple rib fractures has been abused," in the absence of any other explanation; (4) the victim's fractures in his scapula and a specific part of the humerus bone were strongly indicative of child abuse; (5) the x-rays did not suggest that the victim had any type of disease causing bone weakness; and (6) if the victim had no other fractures after his hospitalization, "this would imply that the victim did not have brittle bone disease, otherwise known as osteogenesis imperfecta." *Id.* at *5. And Dr. Perales, an expert in pediatrics and child abuse pediatrics, testified in relevant part that (1) it was her job to rule out the possibility that a metabolic or endocrine disorder could have caused the victim's injuries; (2) it was her opinion that the victim did not suffer from any such condition "that would explain his fractures;" (3) "the victim had thirty fractures, including healing and new fractures;" and (4) these fractures "'resulted from non[-]accidental inflicted trauma.'" [Doc. 7-4, p. 155–56]. *Id.* at *6.

Petitioner testified in his own defense. *Id.* at *6–7. Specifically, Petitioner testified that he did not know the cause of the victim's injuries and that his second written statement to police in which he implicated himself as the cause of the victim's injuries was the result of a police detective threatening that he would never see his child again if he did not cooperate in the investigation, as "he was fearful that his children would end up in foster care." *Id.* at *7. Petitioner therefore attempted to write an explanation for the victim's injuries "'that would . . . satisfy'" the police detective. *Id.* During his trial testimony, Petitioner read aloud the second written statement he gave to police in which he implicated himself for the victim's injuries and denied doing any of the actions described therein except sliding the victim across the bed. *Id.* Petitioner also described an incident where he had fallen asleep, "and the victim had slid between the victim and the armrest, and he picked the victim up quickly, and he was fine." *Id.*

Petitioner denied doing anything to hurt the victim and expressed shock that the victim was injured. *Id.* Petitioner explained his statement to the detective that the victim's injuries were "on [him]" and not his wife by stating that he wanted to keep his children from going into state custody after the detective had "'threatened' him." *Id.* He also explained that he loved the children and wanted his wife to be able to see them. *Id.* Petitioner disputed the victim's mother's testimony that the victim would cry when Petitioner held him and testified that there were times when he could console the victim when she could not. *Id.* Petitioner "acknowledged that his wife had once criticized him for the way he was holding the victim" but denied swinging the victim. *Id.* Petitioner also testified that he had never seen his wife harm the victim or do anything to make him think she had hurt the victim and "did not believe that any other family members would have harmed the victim." *Id.*

Various other witnesses, including two of Petitioner's sisters, an elder at Petitioner's church, a pastor who had known Petitioner his whole life, a lifelong friend of Petitioner, and Petitioner's church friend of twenty years, also testified for the defense. *Id.* at *7–8. These witnesses testified favorably about Petitioner's character as a father and a caregiver to children, among other things. *Id.*

The jury convicted Petitioner of all three counts of aggravated child abuse [Doc. 7-1 p. 26–28]. Petitioner appealed his convictions, the TCCA affirmed them, and the Tennessee Supreme Court denied review. *Lowery I.*

### B. Post-Conviction and Writ of Error Coram Nobis Hearing Summary

Petitioner next filed petitions for post-conviction and writ of error coram nobis relief, in support of which he filed various affidavits [Doc. 7-16 p. 4–12, 40–49, 51–56, 59–60]. The post-

conviction court held a hearing on these petitions [Doc. 7-18], and the TCCA summarized the

evidence presented at that hearing as follows:

> Dr. Julie Mack is a diagnostic radiologist "with a certificate of added qualifications
> in pediatric radiology.["]  She is licensed in Pennsylvania.  Dr. Mack reviewed
> several sets of images of the victim in the present case including CT images from
> January 24 and 25, 2008, and an MRI scan on March 19, 2008.  She testified:
>
>> The infant [victim] had two areas of low density, so CT is all based
>> on density, low density in frontal lobes in the white matter
>> underlying the cortex.  And they were characterized as areas
>> of encephalomalacia was the term used in court and I would agree
>> with that term.  It is an area of volume loss, an area of loss of brain
>> tissue.
>
> Concerning the MRI, Dr. Mack further testified:
>
>> That study also showed the area of brain loss, focal loss of white
>> matter between the cortex so the cortex is the superficial part, the
>> one that is right on top of the brain.  And below that is called the
>> white matter. And that is where the brain tissue loss was.  And the
>> brain tissue loss was associated with signal abnormalities.  And it
>> was testified that those represented blood.  And in my affidavit I
>> explained that blood products of that signal, so it was high on T-1
>> and low on T-2, and that combination, if it was blood, would have
>> been less than two weeks old.  It would have happened while the
>> [victim] was in care.
>
> When asked if there was blood shown in the MRI images, Dr. Mack replied:
>
>> It could have been but then it wouldn't have been traumatic bleeding
>> unless we assume that he was traumatized later, but it also could
>> have been calcification.  Calcification will show up on [an] MRI and
>> will have that signal.  So it would have been evidence of a very
>> remote incident, calcification can occur in the brain and look like
>> blood.
>
> Dr. Mack testified that the CT images from January 24, 2008, did not show
> evidence of "acute hemorrhage" in the victim's brain.  When asked if there was a
> mistake, Dr. Mack further testified:
>
>> Well, yeah.  The testimony wasn't that the CT had hemorrhage[ ].
>> The testimony had always been that the CT didn't show
>> hemorrhage.  The testimony was that the MRI showed blood.  If it
>> was blood, when you and I think of blood we think of the red stuff.

7

If it was blood on the MRI, it would have been less than two weeks old, which means the [victim] would have been bleeding while in protective custody or in care. And that's possible. But you can't use that then to say that it was traumatic. I think the issue I have with the findings on the scan is you can't use brain tissue loss as evidence of trauma. The brain tissue loss in this case was remote at the time of the CT. There was no swelling. Nothing to suggest this happened in the last couple of weeks. And the [victim] was born with forceps. This process, these little subcortical cysts have been described after forceps deliveries.

Dr. Mack agreed that there was no evidence of edema on the CT or MRI scans to support recent brain trauma to the victim. She testified:

Edema is just swelling. If something is . . . swelling can occur after trauma or after stroke. It just is a non specific response of the brain to some type of insult. This brain loss was below the surface of the brain so the implication was, in the trial testimony, as I understood it, is that the [victim's] brain was moving back and forth from being shaken, for instance and that the brain hit the skull. If that were true then the cortex, the surface of the brain, would have been injured. This was below the cortex so that doesn't make sense. I think it is much more likely that these are subcortical cysts, subcortical, the word is leukomalacia, and that is a description of it, what it looks like on pathology, and it can happen after birth trauma. It can also happen from stroke, from venus infractions. And there is a big category of we-are-not-sure-why it is there. [The victim's] delivery; they used forceps. And whatever was seen on CT was old and I think in all likelihood was a birth injury.

Dr. Mack noted that there was no injury to the victim's neck and that he was "completely asymptomatic" when he was scanned. She testified that the "signal alterations" on the victim's MRI scan were "very remote blood products," which meant they dated back many months ago.

Dr. Mack testified that the victim had between twenty and thirty fractures and "except for the elbow that he wasn't moving, was completely asymptomatic." She agreed that ribs can fracture with force. However, Dr. Mack testified that multiple fractured ribs from a high force trauma would create a "flail chest," which would be visible on a physical examination and would have significantly compromised the victim's breathing. She said that flail chest is a medical emergency. Dr. Mack further testified:

And those patients almost always have to be intubated for respiratory support. Again, that is when it happens with high force trauma, it's a medical emergency. This child had four

sequential ribs fractured in two places. He had a piece of his rib cage that was not attached to the rest of it. If I assume that those rib fractures were produced by high force trauma, I must also expect the other things that occur with high force trauma. The other option is that these rib fractures didn't occur all at once. They were the equivalent of stress-type fractures, just overuse of a bone that wasn't ready to handle the forces. So fragility fractures. That is the other possibility when you see all these fractures, which ordinarily you only see in high force injuries, but you had this incongruent baby who has no symptoms. Never did anybody recognize any symptoms despite more than twenty-one fractures of the rib cage.

Dr. Mack testified that ribs can be fractured under low force but that the ribs would not be of normal strength. She further said: "Anytime you have multiple fractures that are asymptomatic, you need to think about bone fragility." Dr. Mack was not aware of any testing in the present case for bone fragility. She noted that there was a fracture to the victim's acromial bone. Dr. Mack testified:

> The acromion is a bone that comes off the scapula and then it meets with your clavicle. And this baby there was a fracture of the acromion on the right it was healing. The acromion is relatively protected, it's behind muscles and behind the shoulder girdle. So the same with the rib fractures, acromial fractures can be seen in high force injuries. But when they are, there is almost always, if not always, surrounding damage to the tissue. Again, I have typically seen in high force trauma acromial fracture in an asymptomatic child. To break that bone, a normal bone, generally requires high force. It's a protected area. And if that area of the chest, if that area of the shoulder, receives a high force blow, for instance, you will see evidence of that, lots of bruising, other bones that are fractured. That bone can also fracture in bone fragility. So bones are weaker than normal. I don't know why that bone does fracture but I have seen it in other cases of bone fragility and I have seen it fracture in the hospital. So we have an X-ray of a normal acromion and during hospitalization a fracture that appears new. So similar images in a fracture has occurred somehow in medical manipulation, whether moving the arms above the head for X-rays, who knows. Nobody really understands why that particular bone may fracture under low force states.

Dr. Mack testified that it would have been important for the attorney to consult with a radiologist in this case in order to help understand the imaging findings because a lot of the fractures were old. She noted that a radiologist could have helped to determine if some of the victim's fractures dated back to the victim's birth.

9

On cross-examination, Dr. Mack testified that she could have come to the same conclusion about the victim's injuries had she examined the medical imaging in 2008. She noted that the medical literature and procedures had been known since before 2008. Dr. Mack admitted that the victim's injuries could have indicated abuse but she said that one would have to do a complete workup in order to eliminate bone fragility as a factor. She did not examine the victim or consult with any of the doctors who had examined the victim or testified at trial. Dr. Mack testified that bone fragility is something that can get better over time depending on what caused the condition.

Dr. Mack testified that the only symptom that the victim had at the time of the imaging was that he was not moving his left arm. She further testified:

> That was one of the thirty fractures. So all of those old fractures, including ones of the lower leg, one of which looked like it had been displaced, meaning the two bones not right next to each other, the child never displayed symptoms from all those other fractures. So he was symptomatic from the left arm, wasn't moving it. That was a symptom.

Dr. Mack acknowledged that there was a bruise seen on the victim's back, in the pattern of an open hand, at the pediatrician's office. The following day Dr. Perales noted that the victim's skin was normal. Dr. Mack testified that she was not sure about the bruise. She agreed that the victim had broken ribs but she could not explain why the victim was not in distress due to the fractures. Dr. Mack asserted that the victim would have been in distress only if the fractures were from high force trauma. She could not say for certain how much pain would be caused by stress fractures from bone fragility but that "stress fractures can occur with minor symptoms[.]" Dr. Mack agreed that acromial fractures are rare. Dr. Mack did not know how the victim's legs were fractured but that one of them could have occurred at birth. She said that the injury to the victim's arm was "acute, less than seven to ten days of age." Dr. Mack agreed that she did not consult with Dr. Jeffrey Abrams, the pediatrician in this case or the expert pediatric radiologist, Dr. Clifford Meservy. She also did not speak with Dr. Perales, the pediatric child abuse expert in this case.

Dr. Charles Hyman testified that he is licensed in the State of California and is a researcher in pediatric bone injury. When asked if he taught on the subject, Dr. Hyman testified: "I have spoken to some groups, however, due to the politics of this situation, even though I was a professor at Loma Linda and spent thirty-five years at Loma Linda, I'm not allowed, because of pressure from the child abuse community, to talk on my research." Dr. Hyman also testified that he had been "excised" from the "child abuse society" because they did not accept some of his medical opinions. He said that his research and opinions were in the "minority of the child abuse group."

Dr. Hyman testified that he reviewed the victim's medical records, Petitioner's two hand-written statements, and a questionnaire that Petitioner completed regarding medical history and potential risks for bone fragility. He further spoke with the victim's mother about "historical facts." Dr. Hyman reached a different diagnosis than that reached by the doctors who treated the victim at the time of the injuries. He said that there was "definitive evidence that [the victim's] bones were abnormal, and the differential diagnosis of this finding must include metabolic disease, stress fractures, and other causes of bone fragility." Dr. Hyman did not believe that all of the victim's injuries were the result of trauma. He thought that some of the injuries could have been caused by the "modeling and remodeling process of the bone" which takes place during the first six months of life outside the womb.

Dr. Hyman testified that if he had been the treating pediatrician in the victim's case, he would have first determined whether the lesions on the CT scan and MRI were to the white matter or grey matter of the brain. He explained that injury to the grey matter would indicate trauma, such as a head bump or skull fracture, and injury to the white matter was known to occur during child brain development. Dr. Hyman asserted that "the literature has a lot of documentation of this starting way before the trial in 2008." He testified:

> [T]hen there is a bruise and so the history of the bruise, as I noted from my records, was that this bruise was on the left posterior back of [the victim]. It was not known to either parent or anyone else who saw the child until they went to the doctor's office. It was noted during the doctor's exam and the . . . so that means a nurse or a nurse assistant could have been involved in handling the baby, also, before weighing and measuring the baby. So that would be the historical timeline. We have had numerous, numerous cases of bruising in infants, I mean, the literature is well documented that infants, even two-month-old infants can have bruising. You can have vascular fragility associated with . . . so this bruise does not have to have been a forceful event. And the question is if this was, there was a question whether it was a hand print or a fist, I certainly have seen cases of handprints on infants that are not forceful holding babies to feed, grasping babies. And these children should have a workup for vascular fragility or minor bleeding disorder. And I don't think [the victim] had any type of evaluation. The other thing that the bruise was not photographed, which if it was going to be part of a forensic evaluation, that is mandatory. So that is, in my opinion, a failure of documentation. It is not transparent and it can't be looked at by other individuals to give opinions on it. Then there is the multiple fractures. And the child did have an acute fracture of the left, I believe the left, arm. This was acute. And this was the symptom that brought the baby to the attention [sic]. This is history given that baby [sic] wasn't using the arm, well, for in one part of the record it says two days; and in another part it says two weeks. From the look

11

of the fracture, it does not fit two weeks but it's certainly compatible with two days because there were no signs of healing. The question is what is the mechanism. And it was stated erroneously, in my opinion, by some of the doctors who evaluated [the victim] in 2008, that this had to be a high force injury. And that is absolutely wrong. It could be a high force injury but there is no sign of high force injury. And all fractures are not completed with a single application of force. So this history of a child just having a hand that is dangling is a history that I have seen dozens of times in these cases. And I consult with a pediatric orthopedist on a lot of these cases. And I didn't specifically on this but they know that you can have the history as stated, so the history is a valid medical history. The child had also an acute rib fracture, one acute rib fracture, left posterior third. That was not noted I believe by the hospital physicians. And then the child had multiple peculiar healing rib fractures in different stages of healing all over the rib cage. And, certainly, these could not be caused by one single event. So the question comes up of the history of the confession of a squeeze that I'm not sure of the date but I think it was some sort of contemporaneous squeeze that the father said he caused. Certainly, couldn't cause all the rib fractures with one event. Then you go down to the legs and the legs, the tibias, the shin bones, and two very peculiar healing fractures, both with what we call exuberant callus, an excessive amount of callus. And I see this in children who have signs of a collagen problem. And we try and get testing on all these children because we can see even ten years up the road collagen morphology and perhaps a genetic variant in a test called whole exome sequencing. So we know what some of the variants, the mutations, the genetic mutations that are associated with bone fragility. And there is fifty or sixty of them and we are putting them in a panel to look for these. So the other thing is that this is very old; and one of them looks like it could be dated to the birth process. Could be two months old. Certainly, none of those two fractures are acute and have nothing to do with a pulling of the legs that were stated in the report by the father within some days or a week or so whenever, I don't remember the exact date. But these were much older. There were a lot of irregularities in a part of the bone called the metaphysis. The metaphysic is the growing part of the bone. And during the growth spurt in the first six months of life there is a rapid laying down of the protein part of the bone called osteoid or matrix and then a slow mineralization component. And so there is a time where there is a temporary fragility that could occur and then we see these mineralized irregularities that are often mistaken for fractures. We know they are not fractures because, A; there is no history of fracture. There is no pain or limitation of motion, no redness, no swelling ever documented in these metaphyseal areas that were

12

listed in the chart. And then you should have had follow-up X-rays to see if these fractures go through the radiographic stages of healing. The metaphysis is a very, very vascular area so there would be bleeding and you would expect radiographic signs of healing, such as endosteal sclerosis or subperiosteal new bone formation or callus formation on the sequence of these events. When you work up, you asked me about the workup, the mandate by medicine in general and also the American Academy of Pediatrics is the fact that child abuse with regard to fractures, there is no fracture that is specific to child abuse. This is stated in the child abuse literature, as well as the non child abuse literature, where there are competing thoughts in many of these areas. You don't have a definitive way of diagnosing child abuse from X-rays, it becomes a default diagnosis. So you have to exclude all reasonable forms of fracturing that could mimic this. And bone fragility is the large topic or large heading that could cause that. There was no comprehensive examination to rule out bone fragility. In fact, this was one of the worse evaluations. It didn't even have basic tests that are done almost everywhere in 2008. And, certainly, even when I was doing it in the seventies. There was not a basic phosphorus or magnesium. There was no look for parathyroid hormone, there was no evaluation of vitamin D metabolites. There was no look at ionized calcium or calcium creatinine excretion or phosphorous creatinine excretion. And there were no tests that were done to look for mineralization or a bone structure. And there is non invasive tests that had been available for decades called quantitive ultrasound. So you would have to do this. You can't just default into that. So one of the points that the doctors at the hospital stated, Mr. Meservy and Perales stated that these had to be high force injuries. There is no way that they can tell whether these are high force injuries. You can't tell. They didn't know bone strength. You can't tell the force that it would take to fracture a bone without knowing bone strength. And you certainly can't tell bone strength by plain X-rays, that is total nonsense, it was a misrepresentation, in my opinion, to the Court.

Dr. Hyman disagreed that a child with fractures like that of the victim's would be crying in pain all of the time. He noted that the victim had an acute left posterior third rib fracture that no one knew about that was not detected by X-ray. The victim also had an acute ulna fracture. Dr. Hyman noted that the victim did not cry in pain unless the area was moved. He also disagreed that all fractures need an explanation and that if a parent or caretaker does not have an explanation for a child's fracture, then they are hiding something. Dr. Hyman further testified: "So this concept that babies are going to be crying in pain and families should know about it, that is not valid science." He said that if there are multiple fractures in "three consecutive ribs that are separated, you have what would be a flail chest and that would be, in adults

or older children, an intensive care situation." However, this can happen in "those children with bone fragility."

Dr. Hyman agreed that his report in the present case was very lengthy because he was "going against established teachings of the child abuse community." He said: "So I put out these reports with hundreds of medical references to show why with child abuse some of the concepts that we are dealing with in this case are incorrect." Dr. Hyman testified that he also reviewed the images in this case with a pediatric orthopedist and the chief of pediatric radiology at Loma Linda Hospital, and he said that there was "a discrepancy of interpretation of findings."

Dr. Hyman testified that he counted more than twenty fractures to the victim's ribs. He said:

> And if you go to the infant trauma literature, you would know that in children with normal bones if you have four or more rib fractures the kid is usually critically ill and in intensive care, you usually have physiological instability. And the only time that I have ever seen so many fractures is in these cases a metabolic bone disease in children that you wouldn't be able to tell.

Dr. Hyman also testified that the "more fractures you have, without any signs of high force injury, means that they can't be high force injury." He said that it was "virtually impossible for this to be a high force, traumatic injury in somebody with normal bone strength." Dr. Hyman noted that the victim's fractures were healing in an unusual way that was only seen with metabolic bone disease and/or stress. He noted that Dr. Meservy, who had treated the victim, said that the "fracture lines were going into the callus. And he interpreted this as refracturing." Dr. Hyman testified that the victim's bones were abnormal and the injuries did not fit the clinical pattern of high force injury.

Concerning the injury to the humerus on the victim's left arm, Dr. Hyman testified that they were mineralization changes not fractures. He said that the injury to the victim's left ulna and radius was a fracture that could have been caused by the "normal activities of daily handling of the child, getting the child in and out of a on[e]sie or lifting children sometimes you can get a bending of this part of the bone." Dr. Hyman did not believe that the radius and ulna fractures were caused by a high force impact. He also did not believe that the injury to the victim's right radius was a fracture; he believed it was an "irregularity" that could have been "metabolic due to growth."

Dr. Hyman testified that the victim had a fracture to his right scapula, which he referred to as an "acromion fracture." Concerning this injury, Dr. Hyman testified:

> And in Kleinman's Classic Textbook of Child Abuse Radiology there is a statement from the eighties that says this is a rare injury

14

and, without-an-explanation, it is child abuse. And here is this without an explanation again. So I have a collection of eleven now that we are finishing a manuscript on. I think [the victim] was the eleventh, or maybe we've had one since. So eleven fractures of this acromion process. You go to the literature and you start looking at fractures of the acromion and all the fractures of the acromion, unless you have bone disease, are high force injuries. And it is a hard area to get to because the acromion is protected by the shoulder girdle. So even if you look at football players and stuff when they get torn rotator cuffs or fractured clavicles, very rarely do they have a fracture of the acromion. So the literature says that when you have blunt force thoracic trauma and you have normal bone strength, it is a rare occurrence and it is a high force injury. And it is always associated with some other fracture or evidence of high force injury trauma in the area of the, in this case it would be the right shoulder girdle. Now there isn't. And it is characteristic of the other ten acromion fractures that we have in these infants. There is no evidence of high force injury and not one of them were symptomatic.

It was Dr. Hyman's opinion that the victim's right radius was not fractured but showed an irregularity of the metaphyseal corner, which he agreed with the radiologist was an irregularity. He said, "And, again, irregularities, differential diagnosis could be traumatic, accidental, as well as non accidental. But it could also be metabolic due to growth."

Dr. Hyman testified that the injuries to the victim's left and right tibias were old and "very atypical injuries." He said that injury to the left tibia "looked like a green-stick fracture, there was exuberant callus. Very, very unusual bone morphology that just does not look normal to me." Dr. Hyman noted that there was a "small segment" of the population that did not heal like everyone else.

On cross-examination, Dr. Hyman agreed that his opinions are not generally accepted by the child abuse society. He said: "I am in the minority of the child abuse group, however, that's why I produce a report with four hundred medical references." Dr. Hyman assumed, based on information from the medical records, that Petitioner or the victim's family did not know about the bruising on the victim's back. He agreed that those who abuse children are not always honest about what happened.

Dr. Hyman testified that Petitioner's statement that he pulled the victim by the leg would not cause the fracture to the victim's tibia. He thought that the injury occurred "in the last week or so" before the imaging. Dr. Hyman testified that there was "[a]bsolutely no evidence" in the record to indicate that the injuries to the victim's ribs were caused by high force trauma. He did not believe that the victim's injuries were non-accidental. He further testified: "These are injuries that are

15

associated one sees with bone fragility disorders. Most of them are due to stress fracture [sic] that magnify." Dr. Hyman testified that the information on which he based his opinion was not new information and that it had been around since the seventies. He said that "bone fragility is not new but ways of diagnosing it [are] new." Dr. Hyman agreed that there was no new information since 2014 that would make his testimony any different than what it would be before 2014. Upon questioning by the trial judge, Dr. Hyman agreed that he did not question any of the doctors who testified in Petitioner's trial. His notes also did not reveal that he reviewed the transcript of Petitioner's trial testimony during which Petitioner testified about holding the victim by his legs and pulling him up and holding the victim up.

Trial counsel testified that he was hired by Petitioner's family to represent him at trial. He reviewed all "the points and medical practice of all the doctors who treated [the victim]." No one ever stated that the victim suffered from a metabolic bone disease. However, trial counsel testified: "There was some discussion or information passed along to me from his family that that may have been an issue." Trial counsel agreed that the State's proof at trial showed that the victim's potassium, sodium, and calcium were normal. The doctors at trial all testified that the victim's blood tests were normal and that there was nothing to indicate that the victim had a metabolic bone disease.

Trial counsel testified that Petitioner's sister went online prior to Petitioner's trial and found a website on brittle bone disease. Trial counsel was then asked to contact the doctor from the website, Marvin Miller. Trial counsel testified:

> Yeah, I had spoken with him on the phone and mailed him records. He did not receive the mailed records so we emailed the records. And, ultimately, when I got to the point of confirming that he had received all the records he indicated that there was some dispute within his practice about him continuing to do testimony or consulting related to this aspect and said he didn't have time to deal with this particular case.

Trial counsel said that he then consulted with Dr. Pedigo, a pathologist, concerning Petitioner's case. He testified that Dr. Pedigo previously worked for the Knox County Medical Examiner's Office and that "he does do consultant work, sort of clearing house work, for legal cases where attorneys need to get some medical information. He reviews the materials and if there is something substantive he will refer you to the appropriate expert." Trial counsel was not certain if Dr. Pedigo lost his medical license but noted th[at] he was "terminated from his employment under some rather unique circumstances." Trial counsel also noted that Dr. Pedigo's "medical capability was not the issue why he lost his job."

Trial counsel testified that he told Petitioner that he had spoken with Dr. Pedigo and that "he would not be available for trial but that he was going to be sort of a

16

clearing house and provide us a starting point if, in fact, he came up with information that was beneficial to us." Trial counsel also noted that Dr. Pedigo was a medical doctor who was qualified to look at the materials in Petitioner's case and "if he found that there was further review that was necessary, then he was going to refer to it but specifically we went to Dr. Pedigo to see if he can make a determination if there is some type of temporary brittle bone syndrome."

Trial counsel testified that Dr. Pedigo reviewed the victim's medical records and did not find anything indicating that the victim had temporary brittle bone issues. He also indicated that all of the tests were normal. The victim's pediatrician, Dr. Machen, testified at trial that he examined the victim and found a bruise that he felt was new because there was no yellow discoloration. Trial counsel did not question Dr. Machen about the State's child abuse theory. Trial counsel testified that there was no further testing done on the victim after he was placed with foster parents and then returned to his mother's care.

Trial counsel recalled that Dr. Abrams, the emergency room physician, testified that it was unusual to have bruises on a two-month-old baby. Dr. Abrams also said that "babies, or infants, that age roll, that someone else would have to cause the bruises[.]" Trial counsel agreed that he did not ask Dr. Abrams any questions about that testimony on cross-examination. It was trial counsel's recollection that Dr. Abrams testified that the fractures and healing ribs would require an external force. He asked Dr. Abrams some questions on cross-examination about that particular testimony, as to whether the injuries could have been caused by accidental means. Trial counsel testified that all of the doctors who testified at trial were concerned with the victim's large number of fractures.

Trial counsel agreed that Dr. Abrams testified that the injury to the victim's left arm must have been caused from twisting or being thrown against a wall. Dr. Abrams testified at trial that the injury could not have been caused from Petitioner pulling the victim up out of a swing. Trial counsel also agreed that Dr. Abrams testified that the victim's legs "would have had to been manipulated or twisted to cause those injuries[.]" Dr. Abrams testified that the injuries could not have been caused by Petitioner sliding the victim across the changing table. Trial counsel testified that Dr. Abrams also said that the victim's bones had "[n]ormal mineralization."

Trial counsel agreed that he did not present any proof at trial that the victim had rolled off of the changing table, fallen down the steps, or been pulled up out of a swing. He said that the State presented some proof of those instances from Petitioner's own statements in juvenile court and to Department of Children's Services (DCS) and Officer Boucher which indicated "squeezing, pulling him up out of the swing and, also, the changing, rolling, or pulling his legs on the changing table[.]" Trial counsel testified that the doctors at trial testified that those actions could not have caused the victim's injuries.

17

Trial counsel agreed that Dr. Meservy, a radiologist, testified at trial on direct examination concerning all of the victim's fractures. Trial counsel said that he did not ask any questions about that because there was nothing to dispute Dr. Meservy's testimony concerning the injuries. Trial counsel also agreed that he asked Dr. Meservy two questions at trial. Trial counsel testified: "I disputed what was causing these injuries. There wasn't a dispute what the injuries the child had."

Trial counsel testified that he asked Dr. Perales at trial concerning the contents of Petitioner's statement about how the victim's injuries occurred. Dr. Perales testified at trial that the swing, squeezing, and the changing table incidents would not have caused the fractures. She agreed with Dr. Meservy that great force, such as a car accident, would have been needed to cause the injury to the victim's scapula. Dr. Perales also testified that the injury to the victim's legs would have to have been from a twisting motion. Trial counsel testified that he also asked Dr. Perales if an infant feels pain. Trial counsel said that Dr. Perales testified that there was no indication of metabolic bone disease. He did not ask Dr. Perales about the fractures because the "issue of whether they were fractures or not was not an issue in this case. It was the manner of how they got there."

Trial counsel testified that the victim's mother told Dr. Machen that Petitioner could not have caused the bruising to the victim because she had not left the victim alone with Petitioner.[1] Trial counsel agreed that it was never a defense that the victim's mother caused the victim's injuries because Petitioner was "adamant that he did not want that issue raised." Trial counsel further testified: "I wanted to bring that up and tried to infer that to the jury. And I think my understanding is after the verdict there were some jurors that had made comments that why wasn't she on trial." Trial counsel testified that he did not consult any other doctors on Petitioner's case because Petitioner "indicated that he did not want to spend any more resources on that." Trial counsel further testified that Petitioner "made it clear that he was not going to spend any more funds in this arena of hiring experts." Trial counsel was aware that an exact time of injury could not be given to healing ribs but that the injury could be classified as acute or chronic.

On cross-examination, trial counsel testified that he has been licensed to practice law since 1994, and at the time of Petitioner's trial, ninety to ninety-five percent of his practice was criminal defense work. He said that the subject of brittle bone disease was discussed throughout Petitioner's case. Trial counsel testified that Dr. Pedigo's advice was "consistent with what those other doctors testified to is that this trauma caused to this child was by some type of extremely violent actions of somebody." Trial counsel testified that Dr. Pedigo was adamant and clear in their

---

[1] This appears to misstate the victim's mother's trial testimony. Specifically, while the victim's mother testified at trial that she told Dr. Machen that her oldest son, Josiah, could not have caused the bruise because she never left Josiah alone with the victim [Doc. 7-3 p. 49], she testified that in the evenings, she and Josiah would go to bed, and Petitioner would do the victim's last feeding of the night [*Id.* at 43–45].

discussions. He noted that Dr. Pedigo "offered that if we disagreed with his opinion or wanted to seek further assistance, he would provide me names of somebody we could discuss with." Trial counsel reiterated that Petitioner advised him that "he was not going to spend any more money on an expert."

Trial counsel agreed that in his cross-examination of the doctors at trial, he attempted to point out that Petitioner's admissions would not constitute the victim's injuries. He testified:

> We even tried to argue that he was candid and honest with the police officer, he was candid and honest with juvenile court, and that if he's candid and honest now before this jury, would these type of actions have caused these injuries.

Trial counsel testified that he was aware of the extent and seriousness of the victim's injuries. He did not see any benefit to having the doctors detail each of the victim's injuries to the jury. Trial counsel noted that there were "at least one or two jurors in this particular case that broke down and were crying during the testimony of those doctors[.]" Trial counsel agreed that his defense in Petitioner's case was not to emphasize the gravity of the victim's injuries in front of the jury. He said: "It was the manner of the cause of those injuries that was the focus."

Trial counsel testified that Petitioner wanted to testify on his own behalf at trial. He thought that Petitioner's testimony hurt his case. Concerning the trial strategy, trial counsel testified: "That the matters that [Petitioner] confessed to in both open juvenile court and in a questioning session with Officer Boucher with the Oak Ridge Police Department, what he admitted to were matters that could not have caused these particular injuries." Trial counsel further testified that they conceded the injuries and "that what my client described on two occasions, and then ultimately on three occasions, were not those matters that caused this child's injuries." He acknowledged that other people had access to the victim including the victim's mother and some other family members. Trial counsel again testified that he was instructed by Petitioner not to implicate the victim's mother.

*Lowery II*, at *8–16. The post-conviction court denied Petitioner post-conviction and writ of error coram nobis relief [Doc. 7-16 p. 64–65], Petitioner appealed [Doc. 7-11], and the TCCA affirmed. *Lowery II*, at *16–22.

Petitioner next filed the instant § 2254 petition [Doc. 1].

## II.   STANDARD OF REVIEW

The Court's review of the habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows a federal court to grant habeas

19

corpus relief on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts." *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold") (citing *Williams*, 529 U.S. at 410). Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Also, before a federal court may grant habeas corpus relief, the petitioner must have first exhausted his available state remedies for the claim. 28 U.S.C. §2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th

20

Cir. 1990) (citing *Justices v. Boston Mun. Court v. Lydon*, 466 U.S. 294, 302–03 (1984)). Tennessee has determined that presentation to the TCCA will satisfy the requirement of presentation to the state's highest court. Tenn. S. Ct. R. 39.

If a prisoner never presented a claim to the highest available state court and a state procedural rule now bars presentation of the claim, the petitioner procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32, 750 (1991). In such circumstances, the claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 2074, 2080 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted"). Tennessee petitioners may generally proceed only through one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule).

On federal habeas review, the district court may review a procedurally defaulted claim only where the prisoner can show cause for that default and actual resulting prejudice, "or . . . that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749–50. Errors of post-conviction counsel cannot generally serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 753–53. But the Supreme Court established an equitable exception to this rule in *Martinez v. Ryan*, holding that the inadequate assistance of post-conviction counsel or the absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. *Martinez v. Ryan*, 566 U.S. 1, 9, 17 (2012). The Supreme Court has described the *Martinez* exception as follows:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a
> defendant's procedural default, where (1) the claim of "ineffective assistance of

trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 13–14, 16–17). This exception, commonly referred to as the *Martinez* exception, applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

## III.   ANALYSIS

In his petition for relief, Petitioner seeks habeas corpus relief from his convictions based on claims of ineffective assistance of counsel. Specifically, Petitioner claims that (1) his counsel was ineffective for not consulting with a radiologist to assist him in understanding the age of the victim's fractures [Doc. 1, p. 10–11]; (2) his counsel was ineffective for not "retain[ing] defense experts in forensic pediatrics and forensic pediatric radiology" [*Id.* at 11–12]; and (3) his counsel was ineffective for not requesting that the court require the victim to undergo bone fragility testing [*Id.* at 13–14]. While Petitioner presented his first two ineffective assistance of counsel claims in his appeal to the TCCA, he presented them together [Doc. 7-20, p. 15–22], and the TCCA therefore addressed them together. *Lowery II*, at *16–19. Thus, after the Court sets forth the relevant standard for Petitioner's ineffective assistance of counsel claims, it will address Petitioner's first two claims together before addressing his third claim.

### A.  Standard

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Supreme Court set forth a two-pronged

test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel was
> not functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment.     Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it cannot be said
> that the conviction . . . resulted from a breakdown in the adversary process
> that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  A petitioner has the burden of proving ineffective assistance of his

counsel.  *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney

performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.

A party asserting an ineffective assistance of counsel claim must "identify the acts or omissions of

counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at

690.  The evaluation of the objective reasonableness of counsel's performance must be made "from

counsel's perspective at the time of the alleged error and in light of all the circumstances, and the

standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient

performance prejudiced the defense.  Thus, "[a]n error by counsel, even if professionally

unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had

no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim

for ineffective assistance of counsel to meet his burden, and if either prong is not satisfied, the

claim must be rejected. *Strickland*, 466 U.S. at 69.  Moreover,  a  habeas  petitioner  alleging

23

ineffective assistance of counsel that he exhausted with the state courts bears a heavy burden, given the "doubly deferential" review of such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### B. Experts

Petitioner faults his counsel for failing to consult with a radiologist to assist him in understanding the age of the victim's fractures and for failing to retain experts in forensics and forensic pediatric radiology to rebut the prosecution's case at trial [Doc. 1, p. 10–13]. Petitioner presented these claims to the TCCA [Doc. 7-20, p. 15–22]. In denying Petitioner relief for these claims, the TCCA cited *Strickland* and *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) and various state court cases. The TCCA found that that Petitioner's counsel's decision not to consult with or retain further experts did not rise to the level of deficient performance because his decision not to do so was strategic. Dr. Pedigo had provided trial counsel an unfavorable opinion regarding the bone fragility issue, and Petitioner refused to spend any more money on experts. *Lowery II*, at *16–19.

Petitioner has not established that the TCCA's denial of these claims was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Like the TCCA, the Court finds that Petitioner has not established that his counsel's decision not to consult with more experts or retain experts for trial under the circumstances of Petitioner's case was deficient performance. As such, the Court will not reach the issue of prejudice under *Strickland*.

The Supreme Court has noted that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton*, 571 U.S. at 273 (quoting *Harrington v. Richter*, 526 U.S. 86, 106 (2011)). But

24

the Supreme Court has also specified that *Strickland* does not "requir[e] for every prosecution expert an equal and opposite expert from the defense," and that counsel may act reasonably in "balanc[ing] limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107.

In *Hinton*, the Supreme Court emphasized that counsel's "selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton*, 571 U.S. at 275 (quoting *Strickland*, 466 U.S. at 690). While the Supreme Court held in *Hinton* that an attorney's failure to request funds from the state to hire a better expert where state law allowed him to do so was deficient performance, it emphasized that this finding was limited only to the attorney's "inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him—that caused counsel to employ an expert that *he himself* deemed inadequate" and therefore should not "launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired." *Id.* at 274–75.

The record establishes that Petitioner's trial counsel attempted to contact a bone fragility expert that Petitioner's sister found, but that expert was unable to review Petitioner's case [Doc. 7-18, p. 32–34]. Petitioner's trial counsel also consulted with Dr. Pedigo, a pathologist, to obtain guidance regarding what, if any, experts he should contact regarding the bone fragility issue, but Dr. Pedigo agreed with the victim's medical providers that the victim showed no sign of having temporary bone fragility issues [*Id.* at *8–9]. Dr. Pedigo nevertheless offered to provide names of other individuals that Petitioner's counsel could contact [*Id.* at 26]. But when Petitioner's counsel told Petitioner about Dr. Pedigo's offer, Petitioner told his counsel that he did not want to spend more money on experts [*Id.* at 26–27, 29]. Petitioner's counsel therefore decided not to consult

with or retain additional experts, as he was "not aware of" experts who would testify for free. Instead, counsel pursued the strategy that Petitioner was candid and honest about his actions, but that the actions of Petitioner did not cause the victim's injuries [*Id.* at 26–27, 33–34].

In his petition, Petitioner asserts that his counsel's failure to consult with and retain additional experts under these circumstances was deficient performance because "[t]here was no tactical reason for trial counsel not to have retained expert witnesses to rebut the prosecution's experts" [Doc. 1, p. 11]. Petitioner then summarizes the testimony of Dr. Mack and Dr. Hyman, the experts who testified on his behalf at the post-conviction/writ of error coram nobis hearing [Doc. 1, p. 10–15]. But to the extent that Petitioner challenges his counsel's failure to consult with and/or retain Dr. Mack, who was willing to testify favorably to Petitioner for free at his post-conviction/writ of error coram nobis proceeding, the record establishes that Dr. Mack was from Pennsylvania, did not advertise herself or have a website, and, at the time of her testimony in Petitioner's case, had testified in approximately thirty cases based on what she assumed were "word of mouth" recommendations arising from her work with the Innocence Project in Wisconsin and two New York City defenders' offices [Doc. 7-17, p. 52–59].

The fact that Petitioner's post-conviction counsel in Tennessee was fortunate enough to discover Dr. Mack despite these apparent limitations on her accessibility does not establish that Petitioner's counsel was deficient for not doing so. This is true especially in light of: (1) the lack of any indication that bone fragility was an issue that could have caused the victim's injuries on the face of the victim's medical records; (2) Dr. Pedigo's expert opinion that bone fragility could not have caused the victim's injuries, which was consistent with the victim's medical providers' opinions; (3) Petitioner's counsel's undisputed testimony that he was not aware of experts that were available free of charge; and (4) Petitioner's refusal to spend money on additional experts.

Accordingly, the Court declines to use hindsight to find that Petitioner's counsel was deficient for not locating Dr. Mack to consult or testify witness in Petitioner's case.

The Court also cannot fault Petitioner's counsel for not locating Dr. Hyman, who testified favorably to Petitioner at his post-conviction/writ of error coram nobis hearing for a significant fee [Doc. 7-17, p. 94], as Petitioner told his counsel that he was unwilling to pay for any more experts. Unlike the petitioner in *Hinton*, Petitioner has not established that his counsel could have obtained funds to hire Dr. Hyman to consult and/or testify in Petitioner's case through other sources, such as the state. To the contrary, as the TCCA noted, Tennessee law only provided funding for experts where the litigant was indigent, and Petitioner has not established that he was indigent at the time his counsel decided not to further pursue experts. *Lowery II*, at *19 (citations omitted).

And to the extent that Petitioner seeks to fault his counsel for not consulting with or retaining other experts who held opinions favorable to him and would consult or testify for free, Petitioner has not established that any other such witnesses were available, such that the Court could fault Petitioner's counsel for not finding them.

The Court agrees with the TCCA that Petitioner's counsel was not deficient under *Strickland* for deciding to focus on a trial strategy of emphasizing to the jury that Petitioner's descriptions of what he had done to the victim could not have caused the victim's injuries after he received Dr. Pedigo's opinion and Petitioner declined to spend more money on experts, as the record demonstrates that this was a reasonable decision under the circumstances. *See Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) (noting that counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). And Petitioner has not demonstrated that the Supreme Court has found that a

materially similar decision of counsel regarding expert witnesses amounted to ineffective assistance of counsel. As such, he is not entitled to § 2254 relief for this claim.

### C. Bone Fragility Testing

Petitioner also asserts that his counsel was ineffective for not requesting that the trial court require the victim to submit to bone fragility testing [Doc. 1, p. 13–14]. But Petitioner never raised such a claim with the state courts, and he cannot do so now. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule). As such, Petitioner procedurally defaulted this claim. And Petitioner does not allege that his post-conviction counsel caused this default, such that *Martinez* could excuse it. *Hugueley v. Mays*, 964 F.3d 489, 498–99 (6th Cir. 2020) (providing that a petitioner relying on the *Martinez* exception "must still demonstrate that the ineffectiveness of his post-conviction counsel was the 'cause' of his default") (quoting *Trevino v. Thaler*, 569 U.S. 413, 423 (2013). Nor does Petitioner set forth any other grounds for the Court to excuse this procedural default. Thus, the Court will not examine the merits of this claim.

## IV.    CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Petitioner has not made a substantial showing that his ineffective assistance of counsel claims related to experts amounted to a violation of his constitutional rights, and reasonable jurists would not debate the Court's finding that Petitioner procedurally defaulted his ineffective assistance of counsel claim regarding bone fragility testing. Accordingly, a **COA SHALL NOT ISSUE**. Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

## V.     CONCLUSION

For the reasons set forth above, the petition for § 2254 relief will be **DENIED**, and this action will be **DISMISSED**. A COA shall **NOT** issue.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**ENTER:**

s/Clifton L. Corker
United States District Judge